UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| Federal Deposit Insurance Corporation, | ) | CASE NO.  1:11CV2574 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| vs. | ) | |
| | ) | |
| AmFin Financial Corporation, et al., | ) | **MEMORANDUM OF OPINION** |
| | ) | **AND ORDER** |
| Defendants. | ) | |
| | ) | |
| | ) | |

This matter comes before the Court on Defendants' motion for judgment on the pleadings (refiled with this Court as Doc. 11-1).  The Court has been advised, having considered the complaint, pleadings, and applicable law.  The motion for judgment on the pleadings is GRANTED.

**I.     LEGAL STANDARD**

Fed.R. Civ.P. 12(c) provides that "[a]fter the pleadings are closed -- but early enough not to delay trial -- a party may move for judgment on the pleadings."  The standard for evaluating a motion for judgment on the pleadings is the same as that applicable to a motion to dismiss under Rule 12(b)(6) for failure to state a claim.  *Ziegler v. IBP Hog Market, Inc.*, 249 F.3d 509, 511-12 (6th Cir. 2001).  The Sixth Circuit stated the standard for reviewing such a motion to dismiss in *Assn. of Cleveland Fire Fighters v. Cleveland*, 502 F.3d 545 (6th Cir. 2007) as follows:

> The Supreme Court has recently clarified the law with respect to what a plaintiff must plead in order to survive a Rule 12(b)(6) motion.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007). The Court stated that "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 1964-65 (citations and quotation marks omitted). Additionally, the Court emphasized that even though a complaint need not contain "detailed" factual allegations, its "[f]actual allegations must be enough to raise a right to

>relief above the speculative level on the assumption that all the allegations in the complaint are true." *Id.* (internal citation and quotation marks omitted). In so holding, the Court disavowed the oft-quoted Rule 12(b)(6) standard of *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957) (recognizing "the accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief"), characterizing that rule as one "best forgotten as an incomplete, negative gloss on an accepted pleading standard." *Twombly*, 550 U.S. at 563.

*Id.* at 548.

If an allegation is capable of more than one inference, this Court must construe it in the plaintiff's favor. *Columbia Natural Res., Inc. v. Tatum*, 58 F.3d 1101, 1109 (6th Cir. 1995) (citing *Allard v. Weitzman*, 991 F.2d 1236, 1240 (6th Cir. 1993)). This Court may not grant a Rule 12(b)(6) motion merely because it may not believe the plaintiff's factual allegations. *Id*. Although this is a liberal standard of review, the plaintiff still must do more than merely assert bare legal conclusions. *Id.* Specifically, the complaint must contain "either direct or inferential allegations respecting all the material elements to sustain a recovery under some viable legal theory." *Scheid v. Fanny Farmer Candy Shops, Inc.*, 859 F.2d 434, 436 (6th Cir. 1988) (quotations and emphasis omitted).

## II. FACTS

The factual background herein is not in dispute. On November 30, 2009, AmTrust Financial Corporation (now known as AmFin Financial Corporation ("AFC")) and five affiliated companies filed for Chapter 11 bankruptcy protection. On December 4, 2009, the Office of Thrift Supervision closed AmTrust Bank, one of the affiliated entities, and appointed the FDIC receiver for the bank. Prior to the receivership, AFC was the parent holding company for AmTrust Bank. This matter appears before the Court pursuant to the FDIC's assertions that a tax refund is property of the Bank and not AFC.

**III. ANALYSIS**

There is no dispute that the AmTrust Bank Group – five debtors and two other entities – filed consolidated federal tax returns. Moreover, there is no dispute that for the five years in question, 2004 through 2009, the rights and obligations of these seven entities were governed by two tax sharing agreements, a 1996 agreement and a 2006 agreement. At issue herein is a tax refund totally roughly $195 million. The FDIC contends that the refund is property of AmTrust Bank, while AFC contends that the refund belongs to it as the holding company and that the FDIC has nothing more than an unsecured claim to the refund. The Court now reviews the parties' contentions.

11 U.S.C. § 541 describes property of the estate as "all legal or equitable interests of the debtor in property as of the commencement of the case" and "[a]ny interest in property that the estate acquires after the commencement of the case." However, the estate's interest in property does not change the pre-bankruptcy nature of the interest. 11 U.S.C. § 541(d). In the instant matter, the FDIC claims that any payment of the refund to AFC is made to AFC as an agent or trustee for the Bank and other members of the tax group.

In support of its claim, the FDIC relies upon *In re Bob Richards Chrysler-Plymouth Corp., Inc.*, 473 F.2d 262 (9th Cir. 1973). "[C]ertain courts have held, that the *Bob Richards* case created a federal common law rule that the parent of a consolidated group receives a tax refund as trustee of a specific trust in the absence of an implied or express agreement to the contrary." *In re BankUnited Financial Corp.*, 462 B.R. 885, 897 (Bankr. S.D.Fla. 2011).

> In sum, where the members of a consolidated tax group have no express or implied agreement or where the agreement does not fully address the relative rights of the parties, most courts have looked to the *Bob Richards* holding to resolve that a holding company in a consolidated group receives the money as an agent and trustee for the group. If there is an agreement, then the court interprets the relative rights of the parties in accordance with the agreement.

*Id.* at 899.

As will be detailed below, the Court finds no merit in the FDIC's contentions that the tax sharing agreements do not fully address the rights and obligations of the entities. Accordingly, the Court declines to adopt and rely upon the *Bob Richards* rule to create an agency or trust as an operation of law.

The 1996 tax agreement contained the following provisions:

**Estimated Tax Payments:**

Estimated federal income tax payments for the Ohio Savings Financial Corporation consolidated group may be made by Ohio Savings Financial Corporation or Ohio Savings Banlc In the event Ohio Savings Bank makes such payments on behalf of the Ohio Savings Financial consolidated group, those members of the consolidated group that are not also members of the Ohio Savings Bank consolidated group shall promptly reimburse the Bank for their allocable share of such tax payments. The amount payable by Ohio Savings Bank and its consolidated subsidiaries is not to exceed the amount that would be payable if the members of the Ohio Savings Bank consolidated group were filing federal income tax returns on a separate company basis.

**Final Inter-Company Tax Settlement:**

Consolidated tax liabilities for the group shall be allocated in accordance with Internal Revenue Code Section 1.1502.33 (d) (2) (ii) in connection with the method described in Regulation Section 1.1552-1 (a) (2). Refunds or payments in accordance with the allocation formulas specified above shall be made no later than 30 days after filing the consolidated federal income tax return.

In addition, the 2006 agreement contains the following:

2. Allocation of Consolidated Taxable Liability

2.1 Consolidated Return. For each Taxable Year, Common Parent and Affiliates shall join in the filing of a Consolidated Return; and the parties agree to file such consents, elections and other documents as may be necessary or appropriate for such purpose. OSFC or Ohio Savings Bank ("Paying Entity") shall pay on behalf of the Affiliated Group, on or before the due date for each Consolidated Return year (including extensions), all Taxes reported thereon.

4

2.2 Allocation of Consolidated Tax Liability Among Common Parent and Affiliates. Each affiliate shall be responsible for and shall reimburse the Paying Entity for its share of the Affiliated Group's Consolidated Tax Liability. An Affiliate's share of the Affiliated Group's Consolidated Tax Liability shall be determined as follows:

2.2.1 If Regular Tax is Payable. If the Affiliated Group's Consolidated Tax Liability is for the Regular Tax, the Affiliate's share of such Tax shall be equal to its Regular Tax Liability, computed on a Separate Return Basis, after taking into account all Consolidated Tax Attributes available to such affiliate to reduce its Separate Tax Liability.

2.2.2 If AMT is Payable. If the Affiliated Group's Consolidated Tax Liability is for the AMT, the Affiliate's share of such Tax shall be the amount of AMT for which the Affiliate would be liable if computed on a Separate Return Basis (and without regard to the Regular Tax for such Taxable Year), after taking into account all Consolidated Tax Attributes available to such Affiliate to reduce AMT.

2.3 Payment

2.3.1 Quarterly Estimated Payments. Each Affiliate shall pay promptly to the Paying Entity, or the Paying Entity shall reimburse the Affiliate for, whichever the case may be, the Affiliate's share of such payment, estimated in the same manner as specified in Section 2.2. Such payments or reimbursements shall be made no later than the end of the month in which the quarterly payment is due to the IRS. In no circumstance shall the Affiliate be required to remit their portion of the payment to the Paying Entity in advance of the date of the payment to the IRS.

2.3.2 Final Tax Return Liability. Following the filing of the Consolidated Return for the Consolidated Return year, each Affiliate shall pay promptly to the Paying Entity or the Paying Entity shall reimburse the Affiliate for, whichever the case may be, the Affiliate's share of such liability, computed in the same manner as specified in Section 2.2. Such payments or reimbursements shall be made no later than the end of the month in which the Consolidated Tax Return is filed with the IRS. In no circumstance shall the Affiliate be required to remit their portion of the payment to the Paying Entity in advance of the filing of the Consolidated Return with the IRS.

3. Utilization of Tax Attributes

3.1 Generally. In certain Consolidated Return years, the Tax Liability of one member of the Affiliated Group may be reduced through the utilization of Net Operating Losses of another member, or the Taxes payable by the Affiliated Group as a whole may be reduced by Tax Credits generated or earned by one member of the Affiliated Group which are in effect used to reduce the Tax

> Liability of the other members. The parties intend that the tax savings attributable to the use of such Tax Attributes should inure generally to the benefit of the member of the Affiliated Group ("Originating Affiliate") that earned or generated the Tax Attributes in question; and that the members of the Affiliated Group should reimburse one another for the value of the Consolidated Tax Attributes utilized in each Consolidated Return year.
>
> 3.2 Reimbursement for Utilization of Tax Attributes. For each Consolidated Return year in which Consolidated Tax Attributes generated or earned by an Affiliate are utilized to reduce the Regular Tax liability of other members of the Affiliated Group (without regard to whether the Affiliated Group's Consolidated Tax Liability for such Taxable Year is computed with references to the Regular Tax or the AMT), the Affiliate utilizing the Tax Attributes shall reimburse the Originating Affiliate for the value of the Consolidated Tax Attributes so utilized. Such reimbursements shall be made as provided in Paragraph 3.4; and the value of the Tax Attributes in question shall be determined by reference to the differences between (i) the Affiliate's share of the Affiliated Group's Consolidated Tax Liability in the Utilization Year(s), and (ii) the share (as calculated pursuant to Section 2.2) of such Consolidated Tax Liability that the Affiliate would have been responsible for had said Tax Attributes not been available to the Affiliated Group in the Utilization Year(s).

As the specifics of these provisions are important, the Court has reproduced them in their entirety.

Upon review of the above language, the Court agrees with AFC that the tax sharing agreements unambiguously create a debtor-creditor relationship between the holding company and its affiliates. Courts across the country have repeatedly held that terms such as "reimbursement" and "payment" in a tax sharing agreement evidence a debtor-creditor relationship. *BankUnited*, 462 B.R. at 900; *In re NetBank, Inc.*, 459 B.R. 801, 814-15 (Bankr. M.D.Fla. 2010); *In re First Central Financial Corp.*, 269 B.R. 481, 497-98 (Bankr. E.D.N.Y. 2001); *In re Franklin Savings Corp.*, 159 B.R. 9, 29 (Bankr. D. Kan. (1993).

> The Tax Reimbursement Agreement ("TRA") provides for "reimbursement" and "credits" to FSA. These terms are inconsistent with the argument that FSA "owns" the refunds. "Reimburse" means "[t]o pay back." Black's Law Dictionary at 1157 (5th ed. 1979). The use of this term is consistent with a "debt" or "receivable," rather than with ownership. If the parties considered the refund to be property of FSA, they could have provided for its "return" to FSA. The parties'

>   selection of terms indicates that they intended the obligation to be in the nature of a receivable. So goes FSC's argument on the meaning of the agreements. In short, under the terms of the agreements, FSA holds only an unsecured claim, not ownership of the refunds.

*Id.* at 29. Similarly, the tax sharing agreements herein repeatedly utilize terms such as "reimbursement" and "promptly settle" undermining any argument by the FDIC that the agreements do not create a debtor-creditor relationship.

The Court would also note that the court in *In re IndyMac Bancorp, Inc.*, 2012 WL 1037481, at *17-18 (Bankr. C.D. Cal. Mar. 29, 2012) (Report and Recommendation later approved by the bankruptcy court) more thoroughly analyzed and rejected the FDIC's reliance on *Lubin v. FDIC*, 2011 WL 825751 (N.D.Ga. Mar. 2, 2011). The Court adopts the *IndyMac* analysis in its entirety. The Court would note that the opposite conclusion reached in *Lubin* was based upon precise language in the tax sharing agreement that created agency, specifically stating that funds were "obtained as agent" for the group members. *Id.* at *5. No such language exists herein.

Furthermore, the Court rejects any notion that Ohio law precludes granting the motion for judgment on the pleadings. Despite the FDIC's contentions, the determination of a lack of agency herein can be made by review of the tax sharing agreements. The agreements are fully integrated and unambiguous. Accordingly, there is no basis for the FDIC's contention that the Court must review other facts to ascertain whether an agency relationship was created. The agreements unambiguously demonstrate a debtor-creditor relationship and nothing more.

The FDIC also contends that if such a relationship is created, then the agreements must be set aside in violation of several federal statutes. The Court similarly finds no merit in these arguments.

7

First, the FDIC contends that 12 U.S.C. § 371(c) invalidates the tax sharing agreements. This statute places restrictions on loans and extensions of credit between related entities. The FDIC contends that these restrictions are violated by the tax sharing agreement. *IndyMac Bancorp* similarly rejected this argument as follows:

> First, it is doubtful that section 371c has any relevance at all. The FDIC cited no case law for the proposition that tax sharing agreements give rise to a "loan" or similar "extension of credit." This contention simply assumes that the Bank owned all the tax refunds ( i.e., the putative loaned or extended property) in the first instance. If this initial premise is wrong, then the FDIC's argument falls apart.

*Id.* at *36 (footnote omitted). The Court then went on to analyze why no loans or extensions of credit were created by a tax sharing agreement. This Court once again agrees with the rationale stated therein. The FDIC, as receiver, would have a right to payment under the tax sharing agreement. Until that payment is received, the FDIC would no property interest in the tax refund. Accordingly, there could be no loan or extension of credit on property not owned by the FDIC/predecessor bank.

Moreover, as *IndyMac* continues, even if the FDIC were correct that the statute applies and *was violated*, its requested relief would still not logically flow. "[C]ourts have considered analogous arguments and rejected the notion that loans or extensions of credit made in purported violation of title 12's restrictions are voidable." *Id.* at *38 (citing *Armstrong v. First Nat'l Bank* (*In re Clothes, Inc.*), 40 B.R. 997, 1000 (D.N.D. 1984); *In re Bates*, 58 B.R. 915, 916–17 (Bankr.W.D.Tenn.1986)).

Finally, the *IndyMac* Court also rejected the FDIC's argument that 12 U.S.C. § 1823(e) serves to invalidate the tax sharing agreement. In that respect, the FDIC argues herein that the tax sharing agreement "tends to diminish or defeat" its interest as a receiver in violation of statutory requirements. Once again, this argument is premised upon a finding that the tax refund

8

was an asset of the bank. As discussed above, the bank had only a contractual right to eventual payment from the holding company. As the bank had no right to the refund prior to receipt, this Court similarly finds that 12 U.S.C. § 1823 does not invalidate the tax sharing agreements. *See id.* at *41.

Finally, the Court would note that the remaining arguments raised by the FDIC, such as mutual mistake, resulting trust, and rejection, have similarly been rejected by *IndyMac* and numerous other courts. The Court finds no reason to restate the rationale employed by those Courts, instead adopting the entirety of the very thorough reasoning offered in *IndyMac*. The FDIC's remaining arguments against enforcement of the tax sharing agreements are therefore rejected.

IV. CONCLUSION

AFC's motion for judgment on the pleadings is GRANTED. The Court finds that the anticipated tax refund is property of the debtor.

IT IS SO ORDERED.


Date: March 26, 2013    /s/ John R. Adams
                        Judge John R. Adams
                        UNITED STATES DISTRICT COURT